**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MARILYN SHANNON McCONAGHY, Receiver of American Universal Insurance Company and Canadian Universal Insurance Company, Plaintiff, | ) | C.A. No. 92-512 L |
| v. | ) | |
| SEQUA CORPORATION, et al., Defendants. | ) | |

**DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF MOTION TO COMPEL**
**ENFORCEMENT OF SETTLEMENT**

The undersigned defendants submit this Reply Memorandum in support of their Motion to Compel Enforcement of Settlement.

## I. Introduction

The Receiver's opposition memorandum does not dispute most of the key points that the defendants presented in their opening memorandum:

- That the critical issue presented is whether Tillinghast was an "agent" of Sequa, within the meaning of the Settlement Agreement;

- That the Receiver herself (now himself) had actual knowledge that Tillinghast was Sequa's "agent," and asserted that fact when it was to her benefit to do so throughout this litigation;

and

- That if the Court applies the general rule of contract interpretation that is applicable to unambiguous terms contained in releases, Tillinghast was an "agent" of Sequa as a matter of law, without the need to resort to extrinsic evidence such as the purported subjective intent of one of the contracting parties.

The Receiver instead stakes her objection on three grounds:

- That the universal rule of contract interpretation is displaced in this case by a narrow exception that is applicable only to persons who attempt to take gratuitous advantage of boilerplate language contained in a release to which they were not a party and were never intended to be beneficiaries (discussed in **Part II** below);

- That Sequa had denied during this litigation that Tillinghast was its "agent," thereby giving rise to a supposed ambiguity in the release (discussed in **Part II(E)** below);

and

- That the conduct of Tillinghast and the parties to the Settlement Agreement proves that the term "agents" did not include Tillinghast (discussed in **Part III** below).

As explained below, the Receiver is incorrect on all three points. At the end of the day, the Receiver is left only with the argument that her counsel (the initial drafter of the language releasing Sequa's "agents") never appreciated that the term "agents" included Tillinghast. The Receiver presents no authority that that is a sufficient basis for avoiding enforcement of the clear and unambiguous release. There is no such authority. Accordingly, defendants' motion to compel enforcement should be granted.

## II. The Receiver's Objection is Based Upon the Marr Case, The Holding of Which Does Not Apply Here

In our opening memorandum, we informed the Court (at page 6) that we understood that the Receiver intended to rely upon Marr Scaffolding Co. v. Fairground Forms, Inc., 682 A.2d 455 (R.I. 1996) as her primary legal authority for resisting enforcement of the Settlement Agreement. We then summarized several reasons why Marr is inapposite. The Receiver nonetheless has made Marr a centerpiece of her opposition papers, without discussing its facts

and ignoring its distinguishing elements. So defendants now turn to a discussion of the very limited applicability of the Marr decision, to extreme situations that are not before this Court.

**A. The Marr Decision.**

Marr presented an unusual set of facts, for which the Rhode Island Supreme Court created a special rule. It has no applicability here.

The plaintiff in Marr rented construction equipment to two separate contractors, on two different job sites. Some of the rented equipment "disappeared" from each construction site. Marr sued both responsible contractors, and the bonding company for one of them, for the value of that equipment. One of the contractors, Fairground, and its bonding company reached a settlement whereby Marr accepted $5,000 for the equipment that had disappeared from that site. In exchange, Marr executed a release "that contained boilerplate phrases purporting to release the entire world from any and all claims" (682 A.2d at 457-58).

Thereafter the second contractor, Cement Heads, moved for summary judgment on the basis that "the omnibus language in the release discharged its liability to Marr" (Id. at 457). The Superior Court granted summary judgment, but the Supreme Court reversed. The Court reaffirmed the general rule "that bars the introduction of facts *dehors* the contract when its language is clear and complete on its face…." Id. at 458. But the Court also recognized an exception to that rule "if, by reason of a mutual mistake common to both sides of the contract, the written document fails in some material respect correctly to reflect their prior completed understanding." Id. at 459. All of the parties to the release in Marr submitted affidavits that they neither bargained for nor intended to provide a release of Cement Heads. Id. at 457. The Court reasoned that Cement Heads, "[a]s a stranger to this release," should not be permitted to "take gratuitous advantage of [an] agreement in which [it] took no part." Id. at 459.

As explained next, the Receiver cannot avail herself of <u>any</u> of the considerations that prompted the Court to adopt the special rule in <u>Marr</u>. This case is controlled by the usual rule of contract interpretation, which does not permit the Receiver to unilaterally walk away from this release.

**B. <u>This Was Not a "Boilerplate" Release That Involved "Omnibus" Language</u>.**

The first reason why <u>Marr</u> does not apply is that the Settlement Agreement here was thoroughly negotiated, not "boilerplate," and was not an "omnibus" form that purported to release the entire world. The parties, through counsel, negotiated and exchanged at least six successive complete drafts of the Settlement Agreement (**Exhibits 1** through **6** appended). The parties also negotiated terms of the Settlement Agreement through numerous emails, letters (e.g. **Exhibits 7** through **9** appended) and telephone conversations. Those negotiations began in April 2004 and extended over some five months. None of that intense negotiation and scrutiny had occurred in <u>Marr</u>, where the Court therefore was uncertain whether the "boilerplate" truly reflected the parties' intent. <u>Id</u>. at 457-58.

Moreover the Settlement Agreement here does not contain "omnibus" language, which the Court in <u>Marr</u> defined as a release of "all other persons, firms, or corporations." <u>Id</u>. at 456. That language greatly troubled the Court in <u>Marr</u>, which referred to it as "grandiloquently, purport[ing] to speak for the world" and as "ventriloquial hubris." <u>Id</u>. at 459. Here, paragraph 1B of the Settlement Agreement carefully defined the parties being released:

> 'Sequa Release Parties' means Sequa Corporation and Chromalloy American Corporation <u>and</u> all of their present and former subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, agents, servants, partners and employees <u>and</u> Norman E. Alexander, Robert E. Davis and Gerald S. Gutterman <u>and</u> all of their present and former heirs, agents, servants and assigns. (underlining in original) (**Exhibit 6**).

In fact, the wording of that very paragraph was extensively negotiated. The Receiver's own original draft (**Exhibit 1**) would have provided a release to Sequa, Chromalloy and their "successors, predecessors, subsidiaries, officers, directors, agents, employees and assigns." (emphasis supplied). Defendants' initial redraft (**Exhibit 2**) inserted an entirely new paragraph 1 (entitled "Definitions"), more broadly defining the terms "McConaghy Release Parties" (¶ 1(A)) and "Sequa Release Parties" (¶ 1(B)). The Receiver's counsel objected to portions of those definitions, which underwent further revisions in succeeding drafts. But there was one constant throughout: starting with the Receiver's very first version, the release always extended to Sequa's (and Chromalloy's) "agents." The Receiver never once sought to exclude Tillinghast from that definition. In short, unlike in Marr, the Settlement Agreement here was the extensively-negotiated result of compromises by both sides regarding numerous interrelated terms, one of which the Receiver now wants to pick out as unenforceable.

How does the Receiver's memorandum deal with this critical departure from the boilerplate document involved in Marr? By arguing (Memorandum, p. 9) that we are "quibbl[ing] about the relative breadth of the language in the Marr release and the language here…." One need only read the Supreme Court's own words in Marr to recognize that the dissimilarity of the releases is not a mere "quibble."[1] This is the first reason why the Receiver's reliance on Marr is misplaced.

---

1 Likewise, courts in other jurisdictions have carefully limited their use of Marr-like exceptions only to those cases involving boilerplate language that purports to release everyone in the entire world. *See, e.g.*, Neves v. Potter, 769 P.2d 1047, 1050 (Colo. 1989)(en banc); Sims v. Honda Motor Co., 623 A.2d 995, 998 (Conn. 1993); Cram v. Town of Northbridge, 575 N.E.2d 747, 747–48 n.2 (Mass. 1991); Russ v. General Motors Corp., 906 P.2d 718, 721 (Nev. 1995); Hansen v. Ford Motor Co., 900 P.2d 952, 960 (N.M. 1995).

### C. Sequa is Not a "Stranger" Trying to Take "Gratuitous" Advantage of a Release to Which It Was Not a Party.

A second critical distinction from Marr is that Sequa itself is seeking to compel enforcement of the Settlement Agreement for its own benefit. It is simply inaccurate for the Receiver to argue (Memorandum, p. 1) that it is non-signatory Tillinghast, not Sequa itself, that seeks to enforce the release of claims against Sequa's "agents". Starting with that wrong premise leads the Receiver to the wrong conclusion.

In May 1987 Chromalloy and Tillinghast entered into an agreement (copy appended as **Exhibit 10**) whereby Chromalloy retained Tillinghast to provide certain services in connection with the proposed sale of the American Universal Insurance Group. Paragraph 8 of that agreement provided in pertinent part

> You agree to indemnify and hold harmless Tillinghast … to the fullest extent permitted by law, from and against any loss, damage, liability, claim or expense related to or arising out of (i) our performance under this agreement …. You also agree to reimburse us … for all expenses (including attorneys' fees and time expended by us … based on our then-current time charges) as may be incurred by us … in connection with investigating, preparing for, or defending any such action or claim, whether or not in connection with pending or threatened litigation in which we are a party. However, you will not be liable for indemnification or reimbursement under clause (i) above if such loss, damage, liability, claim or expense is determined in a final judgment by a court to have resulted primarily from the gross negligence, willful misconduct or bad faith of Tillinghast in performing its services under this agreement.

The Receiver had actual knowledge of this agreement for many years preceding the Settlement Agreement. The Sequa Defendants first produced a copy of the agreement on December 12, 1995, as part of their Rule 26 automatic disclosure in this case. The agreement then

was marked as an exhibit at least seven different times in depositions.[2] In one of those depositions of a Tillinghast representative, conducted on August 26, 1996, one of the Receiver's counsel, Ms. Robinson, asked "what purpose was served by the engagement letter" between Chromalloy and Tillinghast. The deponent responded that one of the purposes was "to provide indemnification to Tillinghast & Company under certain conditions." (Transcript excerpt appended as **Exhibit 11**). Moreover, the Receiver had known for years before the retainer agreement was produced in discovery -- indeed long before this litigation was commenced -- that Tillinghast had acted as an agent for Sequa. Tillinghast representatives personally participated in meetings and other communications with the DBR during 1987 and 1988, leading up to the approval of the sale of the American Universal companies. So the Receiver is in no position to claim surprise that a principal settlement objective of Sequa was to eliminate its potential exposure to its agent, Tillinghast, to indemnify Tillinghast for the Receiver's claims against it.[3]

Tillinghast has always taken the position that its actions on behalf of Sequa and Chromalloy in connection with the sale of AUIG triggered that indemnification provision. The Receiver's claims in this case against Tillinghast were based on those actions. Accordingly, unless the Settlement Agreement extinguished the Receiver's claims against Tillinghast in this litigation, Sequa would have had continuing potential liability to indemnify Tillinghast for future defense costs and any damage award. The release of claims against Sequa's "agents" therefore was of direct and material benefit to Sequa. That is why Sequa, for its own benefit, is seeking to enforce the Receiver's release of claims against its agent, Tillinghast.

---

[2] See depositions of: Charles Cook, conducted May 13, 1996; James Silkwood, conducted June 11, 1986; and Neil Anderson, conducted August 26, 1996.

[3] Sequa and Tillinghast disagree as to the application of the indemnification, but regardless, Sequa stood to benefit directly from the dismissal of the Receiver's claims against Tillinghast.

Contrast the situation in Marr: there the plaintiff settled its claim for the disappearance of its equipment from Fairground's jobsite; the boilerplate release purportedly ran in favor of the entire world; and Cement Heads tried to argue that it was released from liability for the disappearance of different equipment from a different contractor's worksite. The Court correctly characterized that as a "gratuitous" benefit to Cement Heads. But Sequa's payment of 20 million dollars to extinguish all liability (including its fully-disclosed potential contractual liability for the conduct of its agent, Tillinghast) was hardly "gratuitous."[4] The Receiver's argument that "[t]his case presents the precise issue litigated and resolved in Marr" (Memorandum, p.11) represents a flat-out misreading of Marr.

In fact the court itself in Marr made clear that its ruling was not intended to apply to the situation before the Court in this case. The court's opinion stated that

> We might also be more willing to defer to the omnibus language in a general release when, in contrast to the situation here, one of the participants in the settlement who paid consideration for the release claims that inclusion of this omnibus language was intentional, was part of what this participant bargained for to stave off unwanted future claims for contribution or indemnification from unnamed third parties, or was included in the release because it was otherwise of specific benefit to one of the settling parties.

Id. at 458. That description fits this case to a T. Sequa paid 20 million dollars in order to resolve its own potential liability and to stave off the risk of future claims by Tillinghast against Sequa for contribution or contractual indemnification of Tillinghast's attorneys fees, if the Receiver were permitted to appeal the dismissal of her claims against Tillinghast.

---

[4] Compare Marr at 460: "The relatively small amount of the settlement compared to the amount of Marr's other remaining claims itself creates some uncertainty."

**D. There was no Mutual Mistake Here, That Would Justify Consideration Of Extrinsic Evidence as to the Meaning of "Agent".**

There is a third, independent reason why Marr is inapplicable. In Marr, the parties to the release all agreed that it was not intended to apply to a non-signatory, Cement Heads, and they all submitted affidavits to the effect that "they neither bargained for nor intended to discharge any liability that Cement Heads may have to Marr." Id. at 457. That was a critical fact for the Court, which went to considerable length to discuss that it was "reserving judgment" as to situations where there was no such unanimity. Id. at 458. The Court identified as follows the limited exception that it was announcing:

> The rule that bars the introduction of facts *dehors* the contract when its language is clear and complete on its face does not prevent a court from considering such extrinsic evidence if, by reason of a mutual mistake common to both sides of the contract, the written document "fails in some material respect correctly to reflect their prior completed understanding."
> . . .
> In such instances, extrinsic or parol evidence should be admitted for the purpose of reforming the contract to mirror the true intent of the parties.

Id. at 458-59 (emphasis supplied) (citations omitted).

The record in Marr was that "the intent-evidence set forth in the settling attorneys' affidavits points unerringly in the direction favored by Marr -- namely, that ... the parties to the settlement never actually intended to discharge Cement Heads' liability, and their inclusion of such omnibus language in the release resulted from a mutual mistake in draftsmanship rather than their deliberate use of such boilerplate." Id. at 459.

In contrast, the Court here is faced with at most a claim of unilateral mistake by the Receiver. Before settling, Sequa had expressly stated its objective to end its involvement forever in American Universal litigation with the Receiver (which necessarily included its involvement

by reason of its contractual indemnification of Tillinghast). The accompanying Affidavit of Steven R. Lowson, Vice President and Senior Associate General Counsel of Sequa, confirms that fact. Mr. Lowson recounts that in conjunction with the parties reaching tentative agreement on a 20 million dollar settlement payment by Sequa, he told the mediator and the attorneys representing the Receiver that in exchange for that payment there "had to be a complete and final end of Sequa's involvement in the matter" and that "there could be no possibility that somehow Sequa could be dragged back into subsequent litigation proceedings." (Affidavit, ¶4). The Receiver's counsel agreed that "that was the Receiver's intent of the settlement as well." Id. Mr. Lowson then added that "the settlement papers had to be drafted to reflect the finality of the settlement." Id. When the Receiver's initial draft of the Settlement Agreement arrived shortly thereafter, it did reflect that finality, by including a release of Sequa's "successors, predecessors, subsidiaries, officers, directors, agents, employees and assigns." That being so, the Marr exception is inapplicable, and the term "agents" must be given its common and ordinary meaning.

This is a crucial distinction between this case and Marr, yet the Receiver does not discuss or even acknowledge it.

**E. Because the Marr Exception is Inapplicable, The General Rule Must Be Applied.**

For all the foregoing reasons, Marr does not apply. Instead, the Court must apply the general rule of construction applicable to releases, that a word must be given its plain and ordinary meaning. Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004); Textron, Inc. v. Aetna Casualty & Surety Co., 638 A.2d 537, 539 (R.I. 1994). That meaning is to be derived from the intent expressed in the release itself, not some subjective, undisclosed intent in the mind of one of the parties. Westinghouse Broadcasting Co. v. Dial Media, Inc., 410 A.2d 986, 991 n.10 (R.I.

1980). And unless a term in a release is reasonably susceptible of more than one meaning, it is not ambiguous and must be enforced as a matter of law. Rivera, 847 A.2d at 284.

The Receiver's submission makes no attempt whatever to meet her burden of demonstrating that the term "agents" in the Settlement Agreement is reasonably susceptible of any meaning other than that it includes Tillinghast. That omission is particularly significant where, as here, it was the Receiver herself who initially included in the release a discharge of Sequa's "agents." If not Tillinghast, then who would it cover? By the time the Settlement Agreement was negotiated and executed, the only other defendants still standing were Alexander, Davis, Gutterman and Burtt. The release separately discharged Alexander, Davis and Gutterman. No one has ever viewed Burtt as Sequa's "agent" (and the Receiver is still pursuing him in any event). There was no one left, other than Tillinghast, who had any potential liability and could be deemed an "agent" of Sequa. Unless the term "agents" is disregarded entirely -- which runs afoul of basic rules of contract interpretation[5] -- the term "agents" must include Tillinghast. There is no ambiguity in paragraph 1B of the Settlement Agreement.

The Receiver offers one final point in an attempt to muddy this issue. She argues (Memorandum, p. 12) that "[i]n their Answer to the Receiver's First Amended Complaint, Sequa and Chromalloy specifically denied the Receiver's allegation that Tillinghast was their agent." That simply is not so.

The Receiver bases her argument on ¶ 87 of the First Amended Complaint (see **Exhibit 12** appended). That paragraph alleged, in grandiose fashion, that

[5] "When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage must be rejected." Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004).

> At all times relevant to the acts and omissions alleged herein, each defendant in the SEQUA GROUP acted in concert together with and on behalf of one another, and in furtherance of the common and joint purpose of selling AUIC as alleged herein. Also at all times relevant to the acts and omissions alleged herein, TILLINGHAST acted in concert together with and on behalf of the SEQUA GROUP, and in furtherance of the common and joint purpose of selling AUIC as alleged herein. At all pertinent times, WILSON was the officer and/or employee and agent of TILLINGHAST who carried out the acts complained of herein. Because TILLINGHAST acted as the SEQUA GROUP's agent with regard to the sale, and because the SEQUA GROUP, TILLINGHAST, and WILSON acted together in arranging and executing the sale, each is vicariously liable for the breach of duty of the other with regard to the sale as alleged herein.

The Sequa Defendants disputed that any of the named defendants breached any duty to anyone in connection with the sale of AUIC, and that is why they denied this allegation. Accordingly, Sequa and Chromalloy answered paragraph 87 as follows:

> Sequa and Chromalloy deny the allegations contained in paragraphs 87 through 92 of the Complaint insofar as those allegations are directed against them, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraphs 87 through 92.

(see **Exhibit 13** appended).

Tillinghast did the same. The Receiver's attempt to characterize that exchange as a denial by Sequa that Tillinghast was its agent is disingenuous. We identified in our opening memo filings in which all of these parties -- Sequa, Tillinghast and even the Receiver herself -- stated in straightforward words that Tillinghast was an agent of Sequa. And in his Order granting Tillinghast's motion for summary judgment, Judge Strand himself stated that "Tillinghast served as an agent to a disclosed principal, Sequa and Chromalloy, in connection with the sale." (October 2, 2001 Order, at 2) For the Receiver now to pretend otherwise would be equivalent to her denying that the sky is blue.

## III. Even if Parol Evidence Were Admissible, the Receiver Argues Incorrectly that the Parties' Conduct Demonstrates that the Term "Agents" Was Not Intended to Include Tillinghast

As explained above, this case does not come within the Marr exception, and therefore parol evidence is inadmissible to vary the contract terms. In any event, the several bits of parol evidence that the Receiver proffers do not support her position that the parties intended to exclude Tillinghast from the category of Sequa's "agents."

### A. The Conduct of the 2004 Mediation.

The Receiver argues (Memorandum, pp. 5-6) that because Tillinghast did not participate in the mediation session in 2004, that is evidence that the settlement was not intended to dispose of the claims in this case against Tillinghast. Her conclusion is wrong.[6]

Tillinghast always thought it had, in effect, a "free pass" in this litigation, by reason of its contractual indemnification. Beginning with the 1998 mediation (where Tillinghast was present but refused to make any payment toward settlement), Tillinghast steadfastly has refused to contribute any of its own funds to a settlement. The Receiver was well aware of Tillinghast's position, as confirmed in the accompanying Declaration of Daniel J. King, counsel for Tillinghast in this litigation. Mr. King recounts that at the outset of the 1998 mediation, he stated to the mediator that "Tillinghast held indemnity rights from [Chromalloy] and [Sequa] and, as a result, Tillinghast would not be contributing funds to any settlement." Id. at. ¶2. Mr. King goes on to recount that for that reason, "Tillinghast played no substantive role in the negotiations" and that the mediator informed the Receiver and her counsel of that position. Id. Mr. King also states in his Declaration that he had many conversations thereafter with counsel for the Receiver,

---

6 Ms. Robinson's Affidavit states (paragraph 1) that she has "personal knowledge of all of the facts stated therein." But she then goes on to include sheer speculation about communications between Sequa and Tillinghast (paragraphs 4 and 5). The Receiver does the same in her memorandum, at 5 ("the Sequa Defendants acted completely independently from Tillinghast"). That erroneous speculation should be disregarded.

including Ms. Robinson, in which he reiterated that Tillinghast had indemnity rights and would not be contributing to any settlement. Id. at ¶3. If anything, Tillinghast's position hardened after it obtained summary judgment in October 2001, dismissing all of the Receiver's claims against it. So why would anyone expect Tillinghast to attend the 2004 mediation, where it perceived that it had nothing at stake?[7] As the Receiver was well aware, the burden fell on the Sequa Defendants to make this entire case go away. That is why Mr. Lowson stated explicitly in the 2004 mediation that Sequa was interested in a settlement only if it brought a "complete and final end" to Sequa's involvement in this matter and foreclosed any possibility of Sequa being dragged back into subsequent litigation proceedings.

**B. Court Approval of the Settlement.**

The Receiver also argues (Memorandum, pp. 6-7) that it is significant to the interpretation of the term "agents" that the Receiver did not seek court approval of dismissal of her claims against Tillinghast. This is legally incorrect.

Summary judgment had been entered in favor of Tillinghast in October 2001. It never became a final judgment because the claims remained pending against the Sequa Defendants. But once those claims were settled and dismissed, the summary judgment dismissing the claims against Tillinghast became a self-executing final judgment. No court approval of that dismissal was required.

**C. The Post-Settlement Telephone Call with one of Tillinghast's Counsel.**

The Receiver's memorandum refers vaguely to a voice mail message from Mr. King, one of Tillinghast's counsel, that the Receiver invites the Court to infer was an admission that the

---

[7] Since Tillinghast wasn't paying anything, it likewise is of no moment that Tillinghast had no communications with the Receiver regarding the drafting of the Settlement Agreement.

claims against Tillinghast had not been settled. The Receiver's submission falls far short of the mark.

To begin, the Receiver does not place a date on that call. She cannot even suggest that Mr. King had seen by then the provisions of the Settlement Agreement (after all, as the Receiver emphasized above, Tillinghast was not a signatory and, to her "knowledge," did not participate in the drafting). And she apparently has no record of the actual message, other than "something to the effect that, 'we hope that you will now take your money and go home.'" (Affidavit of Ellen G. Robinson, ¶ 6).[8]

There is a significant omission from the Receiver's presentation of this story. Even though the Settlement Agreement disposed of all claims by the Receiver against Tillinghast as Sequa's "agent," the Receiver still had (and has) pending other independent claims against Tillinghast. In the Superior Court action the Receiver has alleged that Tillinghast committed actuarial malpractice in the advice it gave to the American Universal companies about their accounting reserves. (Mayer v. Sequa Corp. et al., P.C. 91-6484, First Amended Complaint, filed March 16, 1992, Counts One and Two). Tillinghast performed that work independently of Sequa, before Sequa retained Tillinghast's services with regard to the disposition of those companies. It cannot even be argued that the actuarial malpractice claims are covered by Sequa's indemnification, and those claims were not affected by the Settlement Agreement. Mr. King's accompanying Declaration makes it clear that the primary purpose of his call to Ms. Robinson was to ascertain the Receiver's intentions with respect to those actuarial malpractice claims. Id. at ¶4. Mr. King explains further that "[c]ounsel for the Receiver had suggested in the past that if the Receiver obtained a satisfactory result in the Federal Court Litigation, it would not continue to pursue the State Court Litigation. My call was intended to determine the Receiver's intentions

[8] The first time the Sequa Defendants heard about that message was in Ms. Robinson's Affidavit.

in this regard". Id. So contrary to the Receiver's submission, the call from Mr. King is no evidence whatever of an acknowledgement by Tillinghast that the claim against it remained alive and appealable.

**D. Tillinghast's Opposition to Joint Motion.**

Finally, the Receiver contends (Memorandum, pp. 7-8) that Tillinghast's objection to the Joint Motion to Dismiss means that it was still on the hook in this case. Not so.

Tillinghast objected to the Joint Motion to Dismiss solely to preserve its claim to contractual indemnification from Sequa for the expense it had already incurred in defense of this litigation. As soon as Sequa stipulated to the preservation of that claim, Tillinghast dropped its objection to the Joint Motion. But for the issue regarding the preservation of its indemnity claim, Tillinghast affirmatively favored the settlement between the Receiver and the Sequa Defendants. The Receiver's distortion of that situation is unseemly.

In sum, none of the Receiver's proposed parol evidence supports her position.

## IV. Conclusion

The Receiver argues (Memorandum, p. 5) that the Sequa Defendants never "indicate[d] by words or deed" that "agents" included Tillinghast. But what exactly is the rule of law that the Receiver is advocating? That a simple contract term like "agents" is not enforceable unless the party seeking to enforce the contract had spelled out in advance what it means? Such a rule would throw contract law into chaos. Not surprisingly, it is most assuredly not the law in Rhode Island (or probably anywhere else).

Frankly, what the Receiver (or her counsel) may have subjectively intended[9] misses the point. There would be no stability in contract law if one side could simply walk away from a clear and unambiguous contract term.

The Receiver's position is even more extreme than that. Apparently she contends that other terms that she deems "omnibus", such as "directors," "officers," "employees," etc. are ambiguous, and leave her free to sue any person or entity within those categories not individually named. To merely state that position is to reject it.

For all the foregoing reasons, defendants' motion to compel enforcement of the Settlement Agreement should be granted.

Matthew F. Medeiros (#1856)
Little Medeiros Kinder Bulman &
Whitney, P.C.
72 Pine Street
Providence, Rhode Island 02903
Tel: (401) 272-8080
Fax: (401) 272-8195

**Attorneys for Defendants Sequa Corporation and Chromalloy American Corporation**

[9] Communication is a two-way street. The Receiver concedes she never communicated to the Sequa Defendants her alleged interpretation of the term "agents." Until the present dispute erupted, the Receiver's statements, allegations and conduct evidenced her belief that Tillinghast was Sequa's "agent."

David M. Hashmall
Leonard F. Lesser
Goodwin Procter LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 459-7430
Fax: (212) 355-3333

**Attorneys for Defendants Norman E. Alexander, Robert E. Davis and Gerald S. Gutterman**

Mark Maloney, Esq.
King & Spalding
191 Peachtree Street, Suite 4900
Atlanta, GA 30303-1763
Tel: (404) 572-4600
Fax: (404) 572-5100

- and -

Michael G. Sarli, Esq.
Dennis T. Grieco, II, Esq.
Gidley Sarli & Marusak
One Turks Head Place, Suite 900
Providence, RI 02903
Tel: (401) 274-6644
Fax: (401) 331-9304

**Attorneys for Towers, Perrin, Forster and Crosby, Inc., as successor by merger to Tillinghast, Nelson and Warren and Tillinghast & Co.**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2005 the within Reply Memorandum in Support of Motion to Compel Enforcement of Settlement was served by First Class U.S. Mail, postage prepaid, upon the following:

Melissa Horne, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903

Ellen G. Robinson, Esq.
Robinson, Curley & Clayton, P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606

Mr. Carleton Burtt, pro se
120 Paul Street
P. O. Box 1264
Walterboro, SC 29488

Veronica Segue