**In The Matter Of:**

*DIAMOND BENEFITS LIFE INSURANCE COMPANY v.*
*SEQUA CORPORATION*

---

*NEIL MARTIN ANDERSON*
*August 26, 1996*

---

*BROWN REPORTING, INC.*
*ATLANTA, ATHENS, AUGUSTA, CARROLLTON, ROME*
*1740 PEACHTREE STREET, N.W.*
*ATLANTA, GA USA 30309*
*(404) 876-8979 or (800) 637-0293*

*Original File 0826ande.asc, 178 Pages*
*Min-U-Script® File ID: 1315749044*

**Word Index included with this Min-U-Script®**

Page 47

your periodic group meetings?
A: I don't recall the – any specific reporting or conversations regarding that.
Q: Okay. And would your answer be the same with regard to – if I had asked you with regard to Mr. Wilson?
A: Yes, ma'am.
Q: Or anyone affiliated with TNW?
A: Any specific conversations regarding –
Q: Yes. Other than those in connection with the December 1987 memorandum that you prepared?
A: I don't recall any.
Q: Okay. Have you had any conversations with Mr. Cohn regarding American Universal Insurance Group during the years 19 – I'm sorry, 1989 forward?
A: Not that I recall.
Q: How about with Mr. Wilson?
A: Not that I recall.
Q: Now, you told me that the professional standards – did you say the – I'm sorry. Strike that.
You talked to us a couple of minutes ago that professional standards required that all assignments have an engagement letter?

Page 48

A: Yes, ma'am.
Q: Okay. Were you referring to the professional standards for TNW?
A: No. I was referring there to the standards of Tillinghast & Company. Certain types of assignments of TNW also required engagement letters.
Q: Okay. Why did the standards of T & Company require an engagement letter? What purpose was served by the engagement letter?
A: The purpose of an engagement letter was to set out clearly the scope of the assignment, the basis for the compensation, the guidelines under which the assignment would be conducted, and also to provide indemnification to Tillinghast & Company under certain conditions.
Q: And why was it a professional standard to have a writing memorializing these things that you've just identified?
A: We considered it good business practice.
Q: And you told me that the engagement letters came through your office. Why was that?
A: We wanted to – excuse me. We wanted to ensure that all the engagement letters included certain – included at a minimum certain

Page 49

provisions.
Q: The provisions that you've just described?
A: Generally, yes.
Q: Any other reasons?
A: We on occasion consulted with our attorneys regarding the negotiation of engagement letters, and we wanted to have that centralized.
Q: Of the principals of TNW who did work for the – in the Tillinghast & Company consulting practice, were any of those principals attorneys? Was Mr. Knowlton an attorney by any chance?
A: Not that I know of.
Q: Okay. So when you say consulted with, you're – you discussed it with your attorneys, you're talking about attorneys outside the firm of TNW?
A: Yes, ma'am.
Q: Okay. During 1986 through 1988, were there any procedures in place at Tillinghast & Company for vetting new engagements before Tillinghast & Company accepted them?
MR. KING: Object to the form of the question.
THE WITNESS: As I recall, we had an

Page 50

engagement letter request form which laid out the particulars of the engagement.
Q: (By Ms. Robinson) Were there any procedures in effect for clearing any potential conflicts of interest when a new engagement came in?
A: That was standard practice to deal with any potential or apparent conflicts.
Q: Other than in a conflict of interest situation, can you think of any circumstances under which Tillinghast & Company turned down a prospective engagement in the MAR field – fields?
A: As I recall, we were unable to successfully negotiate an engagement letter on some occasions, and we would not undertake an assignment without that letter. I don't recall whether there were other reasons we might have turned down –
Q: Ever turn down an engagement because you just didn't want to do business with the person who came to you?
A: I don't recall any specifics, any specific incidents.
Q: So if, for example, Mr. Cohn developed a potential new client, did he have to obtain your approval before committing the firm to an engagement – I'm sorry, your approval of doing work

told me he didn't talk to Chromalloy.
THE WITNESS: The only discussions I recall are those that are addressed in that memorandum in December sometime –
Q: (By Ms. Robinson) Okay.
A: – in that period. I don't recall any prior, you know, regarding the acceptability or the – any of the particulars of the assignment.
Q: Okay. Can you identify the form of the May 20th, 1986, letter to Chromalloy American Corporation signed by Mr. Knowlton as being a standard engagement letter that Tillinghast issued in 1986?
A: It would appear to be a standard engagement letter, yes. I didn't read every word, but it seemed to contain the standard provisions.
(Discussion ensued off the record.)
(Exhibit 1451 was marked for identification.)
Q: (By Ms. Robinson) Mr. Anderson, I'm going to show you a document which I've marked as Exhibit 1451, and the Bate stamps I'll identify it with are T & Co. 010873 through 878. And I'm going to ask if you can identify this as a document that you received on or about May 1st, 1987.



MS. NAKASIAN: I'm sorry. What exhibit number is that?
MS. ROBINSON: 1451.
THE WITNESS: What was the question regarding the document?
Q: (By Ms. Robinson) Can you identify this as a document that you received on or about May 1st, 1987.
A: The cover sheet indicates that it is addressed to me apparently as a fax. I do not recall specifically having received it, and there is not any receive stamp on it to verify that it was actually received. But it – you know, that's what it would appear to be.
Q: Can I ask you if you can identify the receive stamp that appears on the second page of the exhibit, which is 10874?
A: No, I don't – I don't know whose stamp that is.
MS. NAKASIAN: Can I also note for the record that the fax cover sheet indicates that the fax consists of six pages including the cover sheet and this is a seven-page document, so I – and it appears that the last page may not be associated with the rest



of the exhibit. I just note that for the record.
MR. KING: Well, there must be some discrepancy between the document you've received and the one in front of the witness because he's just got a six-page document.
MS. NAKASIAN: I'm sorry. Is it ending on Bate's Page 10878?
MR. KING: Right. It is.
Q: (By Ms. Robinson) Mr. Anderson, independent from any documents, either those that I've shown you or this one that you're looking at now, do you have a recollection of negotiations regarding the terms of the engagement letter entered between Tillinghast & Company and Chromalloy American Corporation in 19 – the period '86, '87, or '88?
A: No.
Q: Do you recall having consulted with an attorney regarding that engagement letter?
A: No, I do not.
Q: And do you recall having discussed that engagement letter with Mr. Cohn?
A: No.
Q: Or anyone else?



A: No.
Q: Okay. On the page which is Bate stamped 10877, if you could turn to that, the – there's a paragraph eight. It's a dense paragraph, but towards the bottom of the paragraph there's this recitation: You, which I take it means the client, shall have the right to assume and control the defense of any claim, demand, lawsuit, or proceeding with respect to which this – I'm sorry, with respect to which indemnification is claimed hereunder, and continues on. If you can –
A: I see the – what you're referring to.
Q: Okay. To your knowledge, had Tillinghast & Co. entered engagement agreements with indemnification provisions that gave the client the right to assume and control the defense of any claim or demand in the past?
A: I don't recall whether that was a – either a standard or an acceptable provision.
Q: Okay. Having reviewed this language which I've called to your attention, does it refresh your recollection about any communications that you had regarding this engagement letter, that is, the engagement letter between Chromalloy and Tillinghast?

Page 75

A: No, ma'am.
MS. ROBINSON: Okay. Where did you put it, Len?
MR. LESSER: I didn't do it.
(Exhibit 1451A was marked for identification.)
MS. ROBINSON: I'm going to mark as Exhibit 1451A – I'm sorry, I got a little screw up in the numbering system, folks – a document which is Bate stamped T & Co. 010840 through 50.
MS. NAKASIAN: Ellen, I think that's been marked previously as Exhibit No. 1300.
MS. ROBINSON: Is that in our case?
MS. NAKASIAN: That's how you all identified it for us, so I think so. We were able to –
MS. ROBINSON: Let's go off the record for a second.
(Discussion ensued off the record.)
Q: (By Ms. Robinson) Please strike my prior designation, and let me tend to you – to you, sir, a document which has already been marked as Exhibit 1300 and has the Bate stamps that I already referenced and ask if you can identify this

Page 76

document.
A: Would appear to be a – two copies of an engagement letter between Chromalloy American Corporation and Tillinghast & Company dated May 18, 1987, which have been executed, and has a cover letter dated May 21, 1987.
Q: And do you recognize the signatures on the pages T & Co. 10845 and then the last page of the document, which is just a copy of the other one?
A: I recognize my own signature.
Q: Do you recognize the signature on the left?
A: No. It would appear to be Mr. Silkwood, but I don't know whether it is or not.
Q: Do you know Mr. Silkwood?
A: No, ma'am.
Q: As you sit here today, do you recall any conversations or communications that you had with a Mr. James Silkwood?
A: No, ma'am.
Q: Okay. Now, on the first page of this Document 1300, there's a stamp in the upper right-hand corner. Do you recognize that stamp?
A: That was a stamp that was typically used on my received correspondence.

Page 77

Q: Do you have any doubt whatsoever that this document, in fact, is a copy of the executed original and executed copy of the fee arrangement letter between Tillinghast & Co. and Chromalloy American Corporation?
A: Well, it had been executed by both parties, but it was not typical for engagement letters to be received with a bunch of markups, and I don't know whether that would be a valid letter or not in that stage.
Q: Okay. I guess my question is do you have any doubt but – do you have any doubt as to whether this document is, in fact, a letter that you received with copies of the attached documents on or about May 21st, 1987.
A: I have no reason to doubt that I received it.
Q: Okay. Now, having reviewed this Document 1300 and noted the interlineations on the – both the executed original and the copy of it, does this refresh your recollection as to negotiations over the terms of the engagement letter between Chromalloy and Tillinghast?
A: No, ma'am.
Q: Can you turn to – I'll identify it as

Page 78

Page 5 using the CD document number. It's – the Bate stamp is T & Co. 010844.
A: Okay.
Q: Okay. The paragraph eight, which begins on the prior page and continues onto this page that we're looking at, provides about, I don't know, 12 lines from the very bottom: You, apparently referring to the client, shall have the sole right to settle or otherwise dispose of any such claim, demand, lawsuit, or proceeding on such terms as you in your sole discretion deem –
A: Just a second. I –
Q: The "you" begins sort of at the end of a line.
A: You shall, is that –
Q: Yes. Exactly.
A: Okay. I'm with you.
Q: Okay. Can you just read that sentence to yourself.
A: Okay.
Q: Was this a standard provision for the Tillinghast & Co. engagement letter indemnification provisions?
A: I don't recall whether it was standard or not.